# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| BRIAN LIPSCOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:11-cv-00481-PPS |
| | ) | |
| STATE OF INDIANA et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Brian Lipscomb was arrested and sent to jail on three separate occasions in a span of three months. Each arrest was made in the small town of Kingsford Heights, Indiana and involved claims that he had violated a protective order that barred him from harassing his ex-wife Casandra Lipscomb. What is puzzling is the fact that each arrest was made by Indiana State Troopers assigned to the Indiana Toll Road post which is several miles away from Kingsford Heights. If one believes Brian, the solution to the puzzle might just be that Casandra happens to be an administrative assistant at the State Police post. And that is what has prompted the bringing of this case alleging a variety of civil rights violations.

The facts surrounding the arrests are hotly contested. Casandra and the troopers involved in the arrests essentially say that Brian was stalking her and her daughter, Danielle Moser, showing up at places where he saw them or knew that they would be and harassing them. From what I can tell, the main evidence of this is Casandra's and Moser's say so. Brian, on the other hand, claims that he was engaging in routine activities during the times in question – things like picking his stepchildren up from school, or getting gas at the only gas station in town. He

steadfastly denies harassing anyone. There appears to be at least some hard evidence confirming Brian's story, at least with respect to two of the incidents.

This matter is before me on a Motion for Partial Summary Judgment. (DE 30.) The defendants ask for summary judgment in their favor on everything except state law malicious prosecution claims asserted against Defendants Casandra Lipscomb and her daughter Danielle Moser.

Normally, the mere possibility that Casandra or Moser might have been lying when they complained to law enforcement officers would be insufficient to allow the false arrest claims against them to proceed. How are the troopers supposed to know that Brian (allegedly) didn't do the things that Cassandra and Moser said? But this case is different. Brian contends that the troopers were more than unwitting pawns in Cassandra's scheme to get him arrested. He asserts that they were in on the plan all along.

This claim is not as farfetched as it might otherwise seem. To start with, there's the odd fact that all of the troopers happen to work with Casandra. As alluded to above, I'm also curious why state police troopers assigned to toll road duty would intervene in a protective order dispute, miles away from any toll road – not just once, but three times. And remember how I said that some concrete evidence supports Brian's account of the incidents in question? Well, there's a marked discrepancy between that evidence and a couple of the officers' versions of events.

All of these coincidences could be just that. Perhaps Casandra and Moser were telling the truth. Even if they weren't, perhaps the troopers really did believe them. Perhaps they were unaware of the evidence suggesting that the harassment claims were exaggerations at best, and out-and-out lies at worst. But Brian has pointed me to enough to suggest that a reasonable

factfinder might be persuaded otherwise. That's enough to defeat summary judgment on at least some of the claims.

Therefore, and for the following reasons, the pending Motion for Partial Summary Judgment (DE 30) is **DENIED IN PART and GRANTED IN PART.**

## BACKGROUND

Brian and Casandra married in 2003. (DE 30-10 at 3.) They had a son[1] and divorced in March 2008. (*Id.*) Their post-divorce relationship is not exactly a model of cooperative co-parenting; they've apparently been squabbling about child custody and visitation issues from the start. (*Id.* at 2-4; DE 32-4 at 2-3.) On September 21, 2009, a protective order was issued barring Brian from threatening or harassing Casandra and her children. (DE 30-8.) It instructed him to avoid Casandra's home, her place of employment, and the local library, store and post office. (*Id.* at 2.)

Casandra works as an administrative assistant in the District 21 of the Indiana State Police. (DE 30-4 at 1.) District 21 is the Toll Road post, and troopers assigned to that post are charged with the responsibility of patrolling – as the name indicates – the Indiana Toll Road. *See* 2011 Ind. State Police Ann. Rep. 27 (*available at* http://www.in.gov/isp/files/2011_Annual_Report_Final_Version_5_17_12). One of the station supervisors is Sergeant Nora Werner, who has been with the Indiana State Police for nearly three decades. (DE 30-1 at 1.) She is a defendant in the case. Two other troopers from that post – Todd LaBonne and Michael Jones – are also defendants. (DE 1.)

---

[1] Their son isn't a party to the litigation. Because he is a child under ten, I will withhold his name from my opinion.

3

There's conflicting evidence on whether Brian harassed or otherwise contacted Casandra and Moser during October and early November 2009. (DE 30-5 at 7-8; DE 30-10 at 5-6, 9.) It seems fair to say that he would encounter them somewhat frequently (DE 30-10 at 5-6, 9) – which is perhaps unsurprising on its face, given that Kingsford Heights is a small town,[2] and both Brian and Casandra have children (other than their son) about the same age at the same school. (DE 30-10 at 5; DE 32-4 at 4-5.)

On November 5, 2009, Casandra was having car difficulties, and she arranged for Trooper LaBonne to take her to and from work. (DE 30-2 at 1; DE 30-4 at 2.) On the way home, he took Cassandra to pick up her son from school. (DE 30-2 at 1-2.) As they were waiting for her son, Casandra complained to LaBonne about Brian's alleged harassment. (DE 30-5 at 7-8.) Casandra and LaBonne saw Brian pull up to the school and park his car. (DE 30-2 at 2.) Brian says that he was there to pick up his other children, though LaBonne says that he didn't see anyone get in the car. (DE 32-2 at 6; DE 32-4 at 4.) LaBonne called up an electronic summary of the September 21 protective order on his squad car computer. (DE 30-2 at 2; DE 32-2 at 9.) He claims that it indicated that Brian should stay away from the school (DE 30-2 at 2; DE 32-2 at 9), though as noted above, the actual order itself says no such thing. (DE 30-8 at 2.) It's unclear whether LaBonne misread the summary or whether the summary was incorrect.

In any event, Brian didn't make any contact with LaBonne, Casandra or their son. (DE 32-2 at 6-7.) LaBonne dropped Casandra and her son at home, and for reasons that are not clear, LaBonne decided to drive by Brian's house. (*Id.* at 6; DE 32-4 at 5.) He claims to have seen

---

[2] According to the 2010 census, the population of Kingsford Heights was 1,435. *See* http://en.wikipedia.org/wiki/Kingsford_Heights,_Indiana.

Brian get out of the car alone.  (DE 32-2 at 6.)  Brian denies this; he says the kids were with him when he got home. (DE 32-4 at 4.)  Fast forward eleven days, though I'll note that why it took so long is entirely unclear.  But on November 16, 2009, LaBonne prepared a police report and probable cause affidavit regarding the November 5 incident at the school with Brian.  (DE 30-5.)  The documents stated that Brian had committed the offense of invasion of privacy on November 5 by violating the terms of the September 21 protective order.  (*Id.* at 4.)  LaBonne also identified a number of earlier incidents in which Brian is alleged to have harassed or threatened Casandra or her children, but he specified November 5th as the date of the offense.  (*Id.* at 7-8.)

The report and affidavit were filed with the LaPorte County Superior Court on November 19, 2009, and a warrant was issued for Brian's arrest.  (DE 30-5.)  The LaPorte Police Department served the warrant at Brian's house on December 4, 2009, and took him to the county jail for processing.  (*Id.* at 1-2.)  Brian was charged with a misdemeanor and released on the same day.  (*Id.* at 2.)  The charges were ultimately dismissed on April 16, 2010.  (*Id.*)

Brian's stay away from the LaPorte County Jail was short-lived.  Casandra arranged for a new protective order to be issued on November 16, 2009.  (DE 30-9.)  This one was similar to the other, though it only instructed Brian to stay away from Casandra's residence and place of employment.  (*Id.* at 2.)  It didn't take long before there was another incident.  On the evening of December 5, 2009 Casandra claimed that Brian violated the order by driving to her house and parking outside.  (DE 30-4 at 2-3.)  She says that he was playing his music loudly and shouting obscenities; Brian denies these allegations.  (*Id.* at 3; DE 32-4 at 6-7.)  One important issue in the case – and it will be apparent why in a moment – concerns the car that Brian was allegedly driving.  The evidence isn't entirely clear, but based on a declaration submitted by Casandra, she

says that it was a Chevy Avalanche.  (DE 30-4 at 3.)

Anyway, Casandra called both the county sheriff and the Indiana State Police to report Brian's alleged harassment.  (*Id.* at 2.)  Troopers Werner and Jones were dispatched to her house.  (DE 30-3 at 1.)  Jones says that while he was there, he saw a Chevy Avalanche drive by.  (*Id.* at 2.)  He pursued the vehicle and stopped it, but Brian wasn't in the car (hence why the exact make and model is important).  (*Id.*)  Instead, it was Brian's mother who said that Brian had her car, a Jeep Cherokee – and coincidentally, he just drove past the scene at that exact moment.  (*Id.*)  Jones got back in his car and pursued Brian.  (*Id.*)  He pulled him over, took him into custody, and then transported him back to the LaPorte County Jail.  (*Id.*)  Brian says that Jones told him in transit that his supervisor (Werner) was going to be "pleased" about the arrest; Jones doesn't recall whether he said anything along those lines.  (DE 32-4 at 10; DE 32-7 at 7.)

Jones prepared a police report and probable cause affidavit on December 7, 2009, and Brian was arraigned and again charged with invasion of privacy on the same day.  (DE 30-6.)  Everyone now seems to agree that the documents contained several major inaccuracies or omissions.  First, Jones indicated that Casandra told him that Brian was driving a Cherokee, and not an Avalanche.  (*Id.* at 6.)  He similarly identified the vehicle that he saw drive past her house as a Cherokee.  (*Id.*)  Finally, Jones's report omitted any mention that he pulled over Brian's mother in an Avalanche.  (*Id.*)  The charges against Brian were dismissed on April 16, 2010.  (*Id.* at 2.)

This wasn't Brian's last encounter with District 21 of the Indiana State Police, either.  On January 22, 2010, Brian pulled into the only gas station in Kingsford Heights.  (DE 32-4 at 13-14.)  There's normally nothing wrong with that, of course.  The problem on that particular day,

though, was that Danielle Moser's car was there as well. (*Id.* at 14.) Brian says that he saw it and drove around the block to give her time to leave. (*Id.*) At the second pass, her car was still there, but he didn't see her at the pump, and he claims that he was concerned that he was going to run out of gas. (*Id.*) So he pulled in to the station to fill up. (*Id.*)

Moser claims (based on the police report of the incident) that he parked behind her car, so close that the bumper was almost touching. (DE 30-7 at 8.) However, most of the evidence indicates that this was incorrect, and Brian actually pulled in to the opposite side of the same pump island as Moser. (DE 32-9 at 10-11.) There's also some dispute as to whether he got out of his car immediately, or whether he sat in it for a minute. (DE 30-7 at 8; DE 32-4 at 23.)

Meanwhile, Moser was in the gas station store with her brother (Brian's son). (DE 30-7 at 7.) She says that they were terrified and decided to hide in the bathroom. (*Id.* at 7-8; DE 30-1 at 3.) She called 911 and Werner, though the latter call was disconnected. (DE 30-1 at 3; DE 30-7 at 7.) After a few minutes, Moser says that she heard Brian enter the store and start shouting about his son. (DE 30-7 at 8-9.) A clerk then alerted Moser that he had left the store, but it turns out that Brian was talking to another customer in the parking lot. (*Id.* at 9.) Finally, after another five minutes or so, he left the premises, and Moser and her brother left. (*Id.*)

Werner managed to get in contact with Moser after Moser arrived back home. (*Id.* at 7.) Later that afternoon, Werner went to Moser's house to take her statement, and Moser provided her version of what took place at the gas station. (*Id.*) Werner began preparing her police report, which was dated January 24, 2010. (*Id.*) It mostly regurgitated what Moser claimed happened. (*Id.*) On January 25, 2010 – after she finalized her report, but before she submitted it to her superior – Werner went to the gas station to investigate the incident further. (DE 30-1 at 4-5; DE

32-9 at 10-13.)  She concluded that based on the make of Brian's vehicle, he couldn't have

parked where Moser said that he did.  (DE 32-9 at 10-11.)  Werner also interviewed the clerks

who had been in the store during the encounter.  (DE 30-1 at 4-5; DE 32-9 at 10.)  They both

denied that Brian made a scene.  (DE 32-5 at 8-10; DE 32-6 at 6.)  Both clerks also say that they

told Werner that as far as they were concerned, he pumped his gas, paid for it, and left without

incident.  (DE 32-5 at 8-9; DE 32-6 at 6-7.)  A few days later, Werner watched the security

camera footage from the gas station, which seemed to confirm the clerks' impression of what

happened.  (DE 30-1 at 5.)

Despite uncovering this new exculpatory information, Werner did not draft a new police

report and probable cause affidavit or amend her old one.  (DE 30-7.)  Instead, on January 26,

1010 her supervisor approved the original version only recounting Moser's (now almost

certainly incorrect) story.  (*Id.* at 7.)  Werner submitted the report and affidavit to the LaPorte

County Court about a month later, on February 26, 2010.  (*Id.* at 4-5.)  Once again, even though

she knew that Moser must have been wrong about several of the things that she said, Werner

didn't change the report or affidavit to reflect her investigative findings.  (*Id.* at 7-10; DE 32-9 at

16-21.)  She didn't disclose that Brian almost certainly didn't pull in closely behind Moser, or

that the clerks' account of what happened in the store largely contradicted Moser's.  (DE 30-7 at

7-10; DE 32-9 at 16-21.)  A warrant was issued on February 25, 2010, and it was served on

Brian on March 10, 2010.  (DE 30-7 at 1-2.)  He was released on bond on the same day, and the

charges were dismissed on January 21, 2011.  (*Id.*)

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A genuine dispute about a material facts exists only "if the evidence is such that a

reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, I must construe all facts and draw

all reasonable inferences from the record in the light most favorable to the nonmoving party.  *Id.*

at 255.  But the nonmoving party is not entitled to the benefit of "inferences that are supported

by only speculation or conjecture."  *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir.

2008) (citations and quotations omitted).

## A.

I'm going to spend most of the rest of this opinion discussing Brian's § 1983 false arrest

claim asserted against the troopers.  Yet his lawsuit encompasses much more than that.  He also

alleges state false arrest claims, state and federal malicious prosecution claims, state battery

claims, some sort of ill-defined due process claim, and a § 1985 claim.  He also has sued more

than just the troopers – he includes his ex-wife Cassandra, her daughter Danielle Moser, the

State of Indiana and the Indiana State Police as defendants.  Indeed, the only claims that aren't

implicated by the pending summary judgment motion are the state malicious prosecution claim

against Cassandra and Moser.  I need to address the remaining claims.

Most of Brian's claims must be discarded for the following technical reasons.  First, none

of the federal § 1983 claims against the State of Indiana and the Indiana State Police can go

forward because a state and its agencies are not "persons" for the purposes of that statute.  *See*

*Will v. Dep't of State Police*, 491 U.S. 58, 70 (1989); *Thomas v. Illinois*, 697 F.3d 612, 613-14

(7th Cir. 2012).

Second, under Indiana law, a police officer may commit battery if he or she uses excessive force during an arrest. *See Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010). But there's no suggestion that any of the troopers used excessive force when arresting Brian in this case – in fact, in two of the three incidents, the troopers weren't even the ones who took him into custody. Therefore, he hasn't brought a cognizable battery claim against any of the defendants.

Third, the federal § 1983 claim against Cassandra and Moser can't proceed because neither of them were acting under the color of law when they (allegedly) fabricated reports of harassment. Moser isn't a government employee or agent, so she can hardly be said to be acting on behalf of the state. *See London v. RBS Citizens, N.A.*, 600 F.3d 742, 746 (7th Cir. 2010) (holding that a private defendant in a § 1983 lawsuit "must be a person who may fairly be said to be a state actor"). And while Cassandra does work for the Indiana State Police, it's as a secretary. That's not enough for a § 1983 action. "'Not every action by a state official or employee is to be deemed as occurring 'under color' of state law'; rather, action is taken under color of state law 'when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010) (*quoting Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989) *and Honaker v. Smith*, 256 F.3d 477, 484-85 (7th Cir. 2001)) (internal citations omitted).

Fourth, Brian can't prevail on his § 1985 claim against any defendants, for two main reasons. As an initial matter, the same § 1983 analysis applies with respect to the State of Indiana and the Indiana State Police, as well as Cassandra and Moser – the former aren't "persons," and the latter weren't acting "under color" of state law. But much more importantly, there isn't any evidence that Brian's alleged mistreatment was motivated by any racial or other

class-based animus as is required in a § 1985 action.  *See Kyle v. Morton High Sch.*, 144 F.3d 448, 457 (7th Cir. 1998) ("[I]t is clear from the reasoning of [prior Seventh Circuit precedent] that a complaint under § 1985(3) must allege a conspiracy motivated by a racial or other class-based animus.").

Finally, the state malicious prosecution claim against the troopers, the State of Indiana and the Indiana State Police is barred by the Indiana Tort Claims Act.  *See* Ind. Code § 34–13–3–3(6) (immunizing state employees from torts resulting from "[t]he initiation of a judicial or an administrative proceeding"); *Clifford v. Marion Cnty. Prosecuting Attorney* 654 N.E.2d 805, 808 (Ind. Ct. App. 1995) (noting that the provision bars malicious prosecution actions against police and prosecutors).

## B.

Where does that leave us?  Well, there's the state malicious prosecution claims against Cassandra and her daughter (Moser).  They aren't implicated by the pending summary judgment motion, so they're going to trial in any event.  Then there are the federal § 1983 and state law false arrest or imprisonment claims.  As I mentioned, those are going to take up most of the rest of my analysis.  But before I get to that, I need to address the § 1983 malicious prosecution claims against the troopers.

The defendants argue that there's no such thing as a constitutional malicious prosecution tort under current Seventh Circuit precedent.  That's not quite right, or at least, it's incomplete. It's true that there's no Fourth Amendment claim in the Seventh Circuit for malicious prosecution by a state or local government.  But the court at least implicitly recognizes that there may be due process concerns if the state in question doesn't provide a common law remedy for

that sort of claim.[3]  *See Avila v. Pappas*, 591 F.3d 552, 553-54 (7th Cir. 2010) (holding that there

generally is no federal constitutional tort for malicious prosecution, "*provided that state law*

*recognizes malicious prosecution as a tort*" (emphasis added)); *Newsome v. McCabe*, 256 F.3d

747, 751 (7th Cir. 2001) ("[W]hen a state-law remedy exists, Justices Kennedy and Thomas[4]

conclude that due process of law is afforded by the opportunity to pursue a claim in state

court....").

    The problem in this case should be self-evident.  I just finished explaining that the

Indiana Tort Claims Act generally bars malicious prosecution claims against government

employees.  And the lion's share of malicious prosecution lawsuits necessarily involve those

people – they're the ones who investigate a matter and initiate a prosecution, after all.  So while

Indiana nominally recognizes malicious prosecution claims, the state's legislature has

immunized most of the people who normally would be subject to them.  Based on this sweeping

immunity, I have real concern whether a criminal defendant's due process rights are adequately

protected against malicious prosecution as required by the Seventh Circuit.

    That said, the briefing on this issue was virtually nonexistent.  The defendants raise the

point that there must be a state law remedy for malicious prosecution, but they dismiss it in a

---

[3] I should be clear that the defendants acknowledge this nuance, though they don't go into it any further than that.

[4] In *Newsome*, the Seventh Circuit attempted to piece together the holding in *Albright v. Oliver*, 510 U.S. 266 (1994), which is the major Supreme Court decision on the issue.  In that case, a four justice plurality opined that there was no constitutional malicious prosecution claim in any guise.  However, two concurring justices (Thomas and Kennedy) were unwilling to go quite that far.  They suggested that there might be due process concerns if a state didn't provide a common law remedy for maliciously prosecuted defendants.  The *Newsome* court viewed that concurrence as the narrowest prevailing opinion in *Albright*, and as such, determined that it was the controlling holding in the case.  *See Newsome*, 256 F.3d at 751.

single sentence by saying that Indiana does recognize that sort of claim. They don't explain whether or how the analysis is complicated by the fact that prosecutors and law enforcement officials are immunized from a malicious prosecution lawsuit. And Brian's doesn't even mention the due process issue in his response.

I'm uncomfortable deciding this issue without further briefing from the parties. Therefore, insofar as the summary judgment motion encompasses the § 1983 malicious prosecution claims against the troopers, it will be denied at this time. However, the defendants are free to re-raise the issue at the close of the plaintiff's case under Federal Rule of Civil Procedure 50. In so doing, the parties should be prepared to argue and submit a supplemental brief at that time explaining whether the Indiana Tort Claim Act's seemingly broad immunity for malicious prosecution claims affects the due process concerns expressed in *Albright* and *Newsome*. Proceeding this way should not effect the presentation of evidence at trial nor prejudice the law enforcement defendants since evidence of malicious prosecution will be presented at trial against Cassandra anyway.

## C.

Now to the main event – Brian's § 1983 and state law false arrest claims. I'll take up the federal claim first. "In order to prevail on a claim of an arrest in violation of the Fourth Amendment, the plaintiff[ ] must show that [he was] arrested without probable cause; probable cause is an absolute defense to such a claim." *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009); *accord Lawson v. Veruchi*, 637 F.3d 699, 703 (7th Cir. 2011).

An arrest warrant normally will be sufficient to shield police officers from false arrest claims. As the Seventh Circuit noted long ago in the oft-cited *Olson v. Tyler*, 771 F.2d 277 (7th

Cir. 1985):

> When a police officer, acting in good faith, obtains a warrant and acts within its
> scope, he has engaged in no official misconduct; it is the magistrate's
> responsibility to determine whether the officer's allegations constitute probable
> cause and it is the magistrate's error if the arrest is later determined to have been
> unlawful.  In such a case, the magistrate's issuance of the warrant shields the
> officer from liability for the illegal arrest.

*Id*. at 281.

While it is true that the troopers obtained arrest warrants for each incident in question in

this case, that does not necessarily bring matters to a close.  This is because there is an exception

to the general rule that a warrant gives an arresting officer probable cause.  The *Olson* court also

observed:

> A warrant does not erect an impenetrable barrier to impeachment of a warrant
> affidavit.  If an officer submitted an affidavit that contained statements he knew to
> be false or would have known were false had he not recklessly disregarded the
> truth and no accurate information sufficient to constitute probable cause attended
> the false statements, not only is his conduct the active cause of the illegal arrest,
> but he cannot be said to have acted in an objectively reasonable manner.

*Id.* (citations and footnotes omitted).  Furthermore, this exception isn't limited to cases where a

police officer intentionally or recklessly provides false information to a magistrate.  It also will

apply when the officer fails to include material facts that might have some bearing on the

decision to issue a warrant (or not).  *See United States v. Harris*, 464 F.3d 733, 738 (7th Cir.

2006) ("Therefore, a defendant may also challenge an affidavit by showing that the affiant

intentionally or recklessly omitted material information."); *United States v. Williams*, 737 F.2d

594, 604 (7th Cir. 1984).

The question before me on summary judgment, then, is whether there's sufficient

evidence for a reasonable factfinder to conclude that the troopers either intentionally or

recklessly provided false statements, or withheld material information, when they submitted their probable cause affidavits.  I must make this determination with respect to each trooper and grant or deny summary judgment on a case-by-case basis.  I'll get to that in a minute.

Before I start, though, there are a few common facts that permeate my analysis.  First, it's undisputed in this case that Casandra worked for the Indiana State Police in the same post as the troopers.  She knew them well enough to request a ride to work from Labonne when she was having car trouble, and her family was socially acquainted with Werner.  I think that's important to keep in mind when looking at the specific evidence in the case.

Also important – and also undisputed – is the fact that the troopers aren't the typical law enforcement officers that you'd expect to be called to intervene in a protective order dispute.  To the contrary, their job is to patrol the Indiana toll road, and write speeding tickets and engage in drug interdiction and the like.  I suppose that it's not surprising to think that Casandra might call them when (she says) Brian was harassing her given her relationship with them, but it's nonetheless something that I need to keep in mind when deciding the summary judgment motion.

### LaBonne

I'll now look at the evidence involving each officer individually, and I will do it chronologically starting with Trooper LaBonne.  As described above, he was involved in a November 5, 2009 incident at Kingsford Heights Elementary School.  There's actually very little disagreement about what happened on that date.  Everyone agrees that LaBonne and Casandra were waiting at the school to pick up Casandra's children when Brian pulled up.  No one has suggested that Brian spoke to Casandra or otherwise contacted her while at the school.  LaBonne does say that Brian had his window down playing loud music, but that is really neither here nor

there.

There are two disputes regarding this incident. The first concerns the specifics of the protective order. LaBonne testified at his deposition that he understood that it barred Brian from coming near the school; Brian says that it didn't. That's easy enough to resolve – I can just look at the order itself. And it shows that Brian is right. The order instructs him to stay away from Casandra's place of employment and the town library, store and post office, but it doesn't say anything about the school.

The second real area of disagreement in this case is *why* Brian was there. LaBonne's incident report doesn't come out and say it, but it seems to imply that he was there to harass Casandra. Brian says that it was to pick up his kids from school, though LaBonne testified that he didn't see anyone get in or out of the car. This is the type of factual dispute that's best left to the jury – though for the purpose of my summary judgment analysis, I must resolve it in Brian's favor and assume that he was there for the reason he claims.

So that's the fact pattern now before me. Brian shows up at the school at the same time as Casandra; he doesn't make any contact with her; he picks up his kids (in his version, which again, I must assume is true for the purposes of my summary judgment analysis); and then he goes home. LaBonne responds to this chain of events by submitting a police report and probable cause affidavit saying that Brian has violated the protective order against him. But there's little dispute that LaBonne's report was simply wrong; Brian was not violating the protective order when he came to the school at the same time as Casandra. And if he was there to pick up his children, it certainly left out that material fact. The only question is whether LaBonne acted intentionally or recklessly when he submitted a report with those defects.

To be sure, LaBonne has a more-or-less reasonable explanation. With respect to why Brian was there, he claims that he didn't know that Brian had other kids at the school. That could be possible. With respect to the specifics of the protective order, LaBonne says that based on the one page summary of the protective order that he could access on his car's computer, he believed that Brian was barred from coming to the school. Maybe he did. Perhaps he read the summary wrong, or perhaps the document was wrong itself. But that doesn't mean that the error was an intentional or reckless one. For his part, Brian doesn't point me to any evidence directly suggesting that LaBonne is lying – but then again, he couldn't, because he can't know what's going on in LaBonne's head.

And that's the point. Whether or not a jury believes LaBonne mostly is going to come down to his credibility at trial. That's the sort of determination that generally can't be made at the summary judgment stage. *See Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). It's true, of course, that a party resisting summary judgment must do more than *solely* attack the relevant witnesses' credibility; the party must point to some independent facts or proof supporting his or her theory of the case. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). But Brian has done that here. He's shown that LaBonne worked with Casandra and was close enough to her to give her a ride to and from work. He's shown that LaBonne was wrong (at the very least) about what the protective order actually said. And he's certainly produced evidence consistent with the notion that LaBonne worked for and with people who seem to have it in for Brian. That's more than the "shred of affirmative evidence" required to challenge a witness's credibility at the summary judgment stage. *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 814–15 (7th Cir. 2005).

### Jones

Brian's next arrest occurred a few weeks later on December 5, 2009, and it involved Trooper Jones. Unlike the previous encounter at the school, there's substantial disagreement as to the events leading up to the troopers' involvement. Casandra says that Brian parked outside of her house shouting obscenities in direct violation of the second protective order issued against him. Brian says that he did no such thing. There's also some confusion as to whether he was driving a Chevy Avalanche or a Jeep Cherokee at the time – the probable cause affidavit says the latter, though Casandra's declaration in support of the summary judgment motion seems to imply the former.[5]

Regardless, everyone agrees that Trooper Jones arrived on the scene and subsequently pulled over the Avalanche, only to find that it was being driven by Brian's mother. Jones asked Brian's mother what Brian was driving, and she told him the Cherokee. Jones then proceeded to stop Brian (who had just driven past) a few minutes later. He then handcuffed Brian and took him into custody. There's also some factual disagreement over what Jones said once he had Brian in the squad car. Brian claims that Jones told him that his supervisor (Werner) was going to be pleased with the arrest; Jones can't confirm or deny that he said something along those lines. In any event, he then transported Brian to the LaPorte County Sheriff's office and filled out an arrest report and probable cause affidavit.

---

[5] I note that the declaration is worded somewhat ambiguously. One paragraph says that Brian stopped in front of Casandra's house and played loud music and shouted obscenities. It doesn't specify what car he was driving. A second paragraph says that he subsequently drove by her house repeatedly in the Chevy Avalanche, but it's silent as to whether it was the same car as before. As I'll explain below, this is an important fact in the case, because he ultimately was stopped in a different vehicle.

That's where the real trouble starts. There's no dispute that Jones's report and affidavit were riddled with errors and material omissions. Indeed, Jones acknowledges as much in his declaration supporting the summary judgment motion. First, in his report, he identifies the car that Casandra says Brian was driving *and* the car that he observed driving by the house as the Cherokee. Jones now admits that, in fact, it was the Avalanche. Second, his report didn't disclose that he stopped Brian's mother in the Avalanche prior to pulling over Brian in the Cherokee. Jones also acknowledges this omission in his declaration.

These errors and omissions are potentially significant. At the time immediately prior to Brian's arrest, he was driving a Cherokee. This is inconsistent with Casandra's declaration testimony that he was driving an Avalanche when he harassed her, and Jones's testimony that he saw an Avalanche driving past her house. By changing the make of the vehicle to match what Brian was driving when he was pulled over, Jones eliminated this inconsistency.

So everyone agrees that Jones's report and probable cause affidavit both contained false information and omitted material facts. But were those defects intentional or reckless? Jones says they were merely inadvertent errors, but as was the case with LaBonne, whether or not the jury will believe him comes down to the question of his credibility. Once again, Brian has produced more than enough evidence to support the argument that Jones shouldn't be believed. There's the fact that Casandra works with Jones; there's the fact that Brian seems to be a frequent target of that particular state police unit, which generally doesn't enforce protective order violations; and there's Jones's alleged statement that his boss (Werner) would be pleased with the arrest. There's also the fact that Jones's many errors and omissions in his probable cause affidavit and police report all seem to make the case against Brian stronger. That's quite a

dubious coincidence, and a reasonable jury certainly could conclude that it rendered his testimony not credible.

## Werner

That takes me to Werner. If you believe Brian, she was the ringleader of the bunch. She was the supervisor of the unit, and she seems to have been socially acquainted with Casandra and her children on a more personal level.

Werner was involved at the margins of the December 4, 2009 arrest (she apparently arrived at Casandra's house but didn't submit a probable cause affidavit), but her most direct involvement came on January 22, 2010, when she investigated an incident at the only gas station in Kingsford Heights. As discussed above, Moser was getting gas when Brian drove in to the station in his Chevy Avalanche. He apparently parked on the same pump island, but on the opposite side. Moser, along with her little brother (Brian's son), were in the gas station at the time, and they went into bathroom to hide, at which point she called 911 and Werner. She said that she was scared, and in a later meeting with Werner that afternoon, claimed that he had pulled in behind her car close enough that the bumpers were nearly touching. Moser further said that Brian threatened her and started shouting about his son. Werner filled out a police report essentially relaying Moser's allegations on January 24, 2010, and it was approved by her supervisor on January 26, 2010. The probable cause affidavit was submitted to the magistrate on February 26, 2010.

What's the problem with all of this? Well, on January 25, 2010 – the day after Werner first completed her report, but the day before her supervisor had reviewed it and more than a month before she submitted it to a magistrate to have a warrant issued – Werner conducted a

follow-up investigation. She examined the scene and interviewed the store clerks at the time of the incident, and a few days later, she watched the security video of the incident. Werner concluded from all of this that (a) Brian did not pull in behind Moser, (b) that he seemed to have pumped his gas, paid for it and left without incident, and (c) the evidence suggested that he didn't shout at or harass anyone. Indeed, according to Werner, the only thing that Brian did wrong was to stop to get gas at the same time as Moser. And I'll note at this point that she seems to be wrong about even that – the protection order in effect at the time didn't bar Brian from being at the same place as Casandra or her daughter. He just couldn't harass them if he was.

Yet despite the fact that Werner knew by January 25, 2010 or shortly thereafter that her incident report relaying Moser's story likely contained significant factual inaccuracies, she didn't bother to change or supplement it. Instead, she let her supervisor approve it, and then a month later, submitted it to a magistrate without one word of caution.

If that's what really happened, then it's hard to imagine a more egregious material omission. Werner essentially had hard evidence that Brian didn't do what Moser said he did. She apparently chose not to disclose that to her superior or the magistrate (at least in writing), despite the fact that there seems to have been ample time to do so. "Police may not ignore 'conclusively established' evidence that defeats probable cause or 'clearly exculpatory facts' ...." *Nelson v. Vill. of Lisle, Ill.*, 437 Fed. App'x 490, 494 (7th Cir. 2011) (*quoting McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) *and Stokes v. Bd. of Educ. of City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010)). And that's precisely what Brian's evidence suggests that Werner did here. That's more than enough for the § 1983 false arrest claims against her to go to trial.

## Qualified Immunity

The troopers all claim that they are protected by qualified immunity because even if they were mistaken in believing that there was probable cause to arrest Brian, the error was a reasonable one. They cite Seventh Circuit precedent suggesting that an officer is reasonable to think that probable cause exists to arrest someone when he or she relies on information provided by a witness, even if that information is incorrect. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 302 (7th Cir. 2011). Therefore, the theory goes, because the troopers didn't have any reason to doubt Casandra's and Moser's complaints about Brian, they were reasonable in arresting him or causing his arrest.

This argument is flawed for two main reasons. First, Brian *has* produced evidence to suggest that they had reason to doubt Casandra's and Moser's versions of events. More importantly, though, the troopers fundamentally misconstrue Brian's theory of the case, at least as I understand it. He doesn't think that the troopers simply were duped into believing Casandra's and Moser's (allegedly) made-up stories about him. He thinks that they were in on it all along – that they either submitted probable cause affidavits and police reports that they knew to be false, or that they intentionally withheld material information that they knew could effect the magistrate's decision to issue an arrest warrant. And he has pointed me to enough evidence supporting that theory to get past summary judgment.

The bottom line is that for Brian to prevail, he must prove that the troopers acted intentionally or recklessly when they submitted probable cause affidavits and police reports containing false information and withholding material facts. If the troopers can show that their mistakes and omissions were innocent, he can't prevail on his claims, qualified immunity or no.

But if Brian does prove what he has to, then their intentional or reckless misconduct necessarily couldn't have been reasonable, and thus, no qualified immunity defense is available. *See Lawson v. Veruchi*, 637 F.3d 699, 704-05 (7th Cir. 2011) (holding that knowingly or recklessly submitting a false arrest warrant application necessarily can't be reasonable conduct).

* * *

Therefore, for the reasons set forth above, Brian has pointed me to sufficient evidence for his § 1983 false arrest or imprisonment claims against Troopers LaBonne, Jones and Werner to proceed to trial.

**D.**

There's one final issue that I must address – the state law false arrest/imprisonment claim against all defendants. "Under Indiana law, false imprisonment is defined as the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent. A defendant may be liable for false arrest when he or she arrests a plaintiff in the absence of probable cause to do so." *Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003) (*citing Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002)) (internal citations omitted). Indiana courts recognize false imprisonment or arrest claims when an individual knowingly provides false information that leads to an arrest of another. *See Williams v. Tharp*, 889 N.E.2d 870, 877 (Ind. Ct. App. 2008)*, rev'd on other grounds,* 914 N.E.2d 756 (Ind. 2009).

There's not any real question that a reasonable factfinder could conclude that this happened in Brian's case. With respect to Casandra, on December 5, 2009, she reported that Brian was parked in front of her house yelling obscenities. As I discussed above, there's some evidence that this didn't happen. That's (potentially) enough to hold her liable for his

subsequent arrest. Similarly, Brian has pointed to several pieces of evidence suggesting that Moser made up many of the details surrounding the January 22, 2010 gas station incident. If that's the case, then she could be liable as well.

With respect to the troopers, I won't rehash my discussion of whether Brian has pointed to evidence sufficient to suggest that they knowingly submitted police reports and probable cause affidavits containing false information and material omissions leading to his arrest on multiple occasions. He has, and that's enough to proceed on his state law false arrest or imprisonment claims against them. And there's no immunity for these claims. The Indiana Tort Claims Act immunity provision specifically exempts claims of false arrest and imprisonment from the otherwise broad immunity enjoyed by police officers in Indiana. *See* Ind. Code § 34–13–3–3(8). So the officers can't claim immunity to shield themselves from these allegations.

And lastly, what about the State of Indiana and the Indiana State Police? Brian is suing them as the troopers' employers under a vicarious liability theory. "The general rule is that vicarious liability will be imposed upon an employer under the doctrine of *respondeat superior* where the employee has inflicted harm while acting 'within the scope of employment.'" *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008) (*quoting Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 148 (Ind. 1999)).

In this case, there's no dispute that the troopers were employed by the State of Indiana and its agency, the Indiana State Police. And there's no suggestion that they weren't acting in their official capacity as state police troopers during the events in question. They wore their uniforms, and the type of activities that they engaged in – investigating potential wrongdoing, arresting suspects, and submitting official police reports and probable cause affidavits – are

quintessential law enforcement functions.  That's enough to hold the State of Indiana and Indiana State Police vicariously liable for their employees' alleged misconduct (assuming a jury believes Brian).  *See Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1209-10 (Ind. Ct. App. 2011) (holding that a uniformed firefighter participating in firefighting efforts was acting within the scope of employment).

## CONCLUSION

For the foregoing reasons, the pending Motion for Partial Summary Judgment (DE 30) is **GRANTED IN PART and DENIED IN PART**.  Specifically, the following claims will proceed: the state law malicious prosecution claim against Casandra and Moser, the § 1983 false arrest/imprisonment claims against Troopers LaBonne, Jones and Werner, and the state law false arrest/imprisonment claims against all defendants.  The § 1983 malicious prosecution claim against the troopers will also go forward but with the caveat discussed. Summary judgment is granted with respect to all other claims.

**SO ORDERED.**

**ENTERED:** April 19, 2013.


s/ Philip P. Simon_____
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT